## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**KENNETH R. SHARP,**
**Plaintiff,**

*vs.*                                                   **CASE NO. 1:06-CV-156**
                                                        **(Chief Judge Keeley)**

**COMMISSIONER OF SOCIAL SECURITY,**
**Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income (SSI) under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross Motions for Summary Judgment and has been referred to the undersigned United States Magistrate Judge for submission of a Report and Recommendation. 28 U.S.C. § 636(b)(1)(B).

## I. Procedural History

Kenneth R. Sharp ("Plaintiff") filed his application for DIB and SSI on March 1, 2004, alleging disability as of May 1, 2003, due to back and hip injuries, arthritis, hypertension and breathing problems. The application was denied initially and on reconsideration. Plaintiff requested a hearing which was held before Administrative Law Judge Randall L. Moon on September 6, 2005. Sharp, represented by attorney Travis Miller, testified as did an impartial vocational expert (VE), Lawrence Ostrowski, Ph.D.

On December 16, 2005 the Administrative Law Judge issued his Decision concluding that Sharp was "not disabled within the meaning of the Social Security Act." R. 17. In so doing, the

ALJ, utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520, made the following findings:

1. The claimant meets the non-disability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant's chronic obstructive pulmonary disease (COPD), hypertension, and obesity are considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(C) and 416.920(C) .

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6. The claimant has the following residual functional capacity: he can perform a wide range of sedentary physical exertional work activities. The claimant can sit/stand/walk up to six hours in an eight hour workday. He should not stand/walk for more than one-half hour at a time. he can occasionally climb stairs, balance, stoop and kneel. He must not be exposed to unprotected heights or dangerous and moving machinery. He must not be exposed to excess amount of fumes, odors, dust, or work in poor ventilation setting. he can perform a wide range of unskilled entry level work activities.

7. The claimant is unable to perform any of his past relevant work (20 CFR §§ 404.1565 and 416.965).

8. The claimant is a "younger individual" (20 CFR §§ 404.1563 and 416.963).

9. The claimant has "a limited education" (20 CFR §§ 404.1564 and 416.964).

10. The claimant has no transferable skills form any past relevant work. (20 CFR §§ 404.1568 and 416.968)

11. The claimant has the residual functional capacity to perform a significant range of sedentary work (20 CFR §§ 404.1567 and 416.967).

12. Although the claimant's exertional limitations do not allow him to perform the full range of sedentary work, using Medical-Vocational Rule 2301.19 as a framework for decision making, there are a significant number of jobs in the national economy that he could perform. Examples of such jobs include work as an assembler/small parts, with 16 jobs regionally and 26,093 jobs nationally; as a surveillance service monitor, with 13 jobs regionally and 12947 jobs nationally; and as a hand packer, with 7 jobs regionally and 10,560 jobs nationally. The VE testified that the requirements of the sampling of jobs provided don not have requirements listed in the *Dictionary of Occupational Titles* that exceed the limitations of the claimant.

The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the

final decision of the Commissioner.

## II. Contentions of the Parties

**Plaintiff's Contentions**

1.  "The ALJ erred by failing to include all of Mr. Sharpe's limitations in his RFC and Hypothetical to the VE.

2.  The ALJ erred by failing to properly consider Listing 3.02A.

3.  The ALJ erred by failing to properly consider the issue of credibility.

**Defendant's Contentions**

1.  Substantial evidence supports the Commissioner's decision that Plaintiff was not disabled.

2.  The residual functional capacity assessment and hypothetical question accounted for all of Plaintiff's limitations.

3.  The ALJ properly considered Listing 3.02.

4.  The ALJ conducted the proper credibility analysis pursuant to the regulatory standard, case law and Social Security Ruling 96-7p.

## III. Statement of Relevant Facts

Kenneth Ray Sharp, born November 10, 1957, filed his application of supplemental security income benefits on March 1, 2004 asserting he became disabled on May 1, 2003. R. 348-351.

A February 16, 2001 control ECG performed on Sharp revealed "normal sinus rhythm within normal limits" and a stress ECG on the same date revealed "sinus tachycardia within normal limits. R. 290.

On June 12, 2002 Sharp appeared at the emergency room of the Davis Memorial Hospital in Elkins, West Virginia complaining of waxing and waning shortness of breath after getting overheated at his work on a saw mill. Sharp was discharged to home with a diagnosis of acute

asthmatic bronchitis. R. 174-175. Sharp's blood test was negative for AMI and otherwise indeterminate. R. 178. Portable chest x-ray revealed no evidence of acute cardiopulmonary process. R. 179. It was an AP radiograph and was compared with a study dated April 6, 1998. It showed the heart to be "at the upper limits of normal for size;" "[t]he mediastinal contours appear[ed] to be normal;"" [t]he lungs [were] clear and the costophrenic angles [were] sharp"; "[t]he bony structures appear[ed] intact." R. 280. A CT with contrast of Sharp's chest was performed on June 21, 2002 at Davis Memorial Hospital showing the lungs to be well inflated and generally clear. The radiologist did not read "any inflammatory change, mass, vascular abnormality or pleural fluid or thickening." He reported the "hilar and mediastinal areas appear[ed] to be normal as well with no mass or adenopathy." He saw "no abnormality of the airway structures" and the "upper abdominal images appear normal as well." The CT Chest Scan of the chest was "normal." R. 180 and 269.

On September 25, 2002 Sharp reported to the emergency room of the Davis Memorial Hospital complaining of right elbow pain resulting from a slip and fall at work 2 days earlier. R. 182. He was discharged to home on the same day with a diagnosis of contusion/sprain to the right elbow. R. 185. X-Ray of the right elbow was negative.

On May 12, 2003 Sharp reported to the Davis Memorial Hospital complaining of nausea, vomiting and abdominal pain. Complete x-rays of the abdomen and PA of the chest revealed: "Supine and upright films of the abdomen demonstrate a nonspecific bowel gas pattern. There is no sign of organomegaly, mass, free fluid, or free air. No abnormal calcifications are seen. Accompanying chest film demonstrates normal configuration of the heart, lungs, and mediastinum." R. 193. Two days later (May 14, 2003) x-rays were taken of Sharp's left and right hips because of his complaints of pain. The x-rays were negative. R. 195.

On September 4, 2003 Sharp reported to Davis Memorial Hospital complaining of chest pain.

Physical examination reflected a "45 year old male lying on the bed in no acute distress at the time of ... examination." HEENT - normal. "The heart is a regular rate and rhythm without murmurs, rubs, clicks or gallops. The lungs are clear. Breath sounds are equal. There is no wheezes or crackles appreciated. Abdomen is soft and non-tender and no organomegaly or masses. Extremities have no cyanosis, clubbing or edema. Neurologic examination - there is no focal motor or sensory deficits. Cranial nerves appear to be intact." The hospital restarted him on his blood pressure medications which he had not been taking to see if his symptoms would improve once his blood pressure was controlled. R. 199-200. The hospital ordered serial CK enzymes to rule out myocardial infarction. His portable chest x-ray was normal. R. 201-209, 264.

Sharp reported to the emergency room of Davis Memorial Hospital on January 21, 2004 complaining of left hip, shoulder and elbow pain from his reported fall at home when his left leg gave out. He also complained of chronic back pain from frequent falls. X-rays of the: lumbo-sacral spine were negative showing it to be "well aligned" with "no fracture seen" and "[n]o significant degenerative change ... noted;" left hip were negative showing "[b]ony mineralization is normal," "[n]o traumatic or destructive lesions ... seen,""joint and articular spaces ... well preserved" and "no soft tissue abnormalities ... found;" "pelvis normal "demonstrating good bony mineralization; [n]o traumatic or destructive lesions ... seen," "SI joints and hip joints appear intact" and "soft tissues are unremarkable;" and left humerus was negative with "[b]ony mineralization ... normal," "[n]o traumatic or destructive lesions ... seen," and "[n]o soft tissue abnormalities found." Overall the examination of the pelvis was "negative." R 210-217.

Sharp is next seen on February 2, 2004 by Mary Phillips at the Valley Health Care, Inc., located in Mill Creek, W.V. for follow-up on the x-rays taken at Davis Memorial Hospital relative to his fall of two weeks ago. Sharp walked with a limp; had noted tenderness over the lumbar; had

positive straight leg raises; was unable to perform heel to toe walks; had equal and strong great toe strength; forward flexion was 16" from the floor; and he had tract edema in the lower legs. He was again non-compliant with taking his medications (blood pressure) because of reported financial inability to pay for them. Sharp complained of "urinating every 2 hours. Denies burning or diff. starting stream. States also urgency." He had no chest pain, nausea or vomiting. Sharp complained of pain in both hips and claimed he was told "he has arthritis." Sharp is reported to have a history of asthma and uses an Advair inhaler.

Sharp was seen in the Davis Memorial Hospital Emergency Room on March 14, 2004 for complaints of pain secondary to an initial fall 2-4 weeks prior and a second fall on the day of presentation. It was noted that he had antalgic gain and complained of pain in his knees. R. 235. X-rays of his right knee "demonstrate some very minimal degenerative change but no traumatic or destructive lesions" and "no joint effusion or soft tissue abnormalities." R. 237. X-ray of the left knee was normal. "Bony mineralization is normal. No traumatic or destructive lesions are seen. The joint spaces and articular surfaces are well preserved. No soft tissue abnormalities are found." R. 238.

Sharp is seen by Kip Beard, M.D. on May 3, 2004 for a disability evaluation. His chief complaint on presentation was "shortness of breath, hypertension, back pain and joint pain." R. 239. At the time of his examination he was 47 years of age, 6 ft. 2 in. tall and weighed 306 pounds in "stocking feet." R. 241. Based on the physical examination, Dr. Beard reported in summary that:

> The claimant is a 47 year old male with history of shortness of breath. Examination of the lungs today reveals diminished breath sounds without wheezes, rales or chonchi. I did not appreciate exertional dyspnea or accessory muscle recruitment today. There was no clubbing or cyanosis. Pulmonary functions reveal serve restrictive disease.
> Regarding the hypertension, I did not appreciate end-organ damage related to this.
> Regarding the lower back, examination reveals some motion loss with pain and

tenderness and muscular rigidity. Straight leg raising is negative. Neurologic is negative for radiculopathy. Regarding the arthritis, examination of the joints reveals findings more suggestive of osteoarthritis. I did not appreciate inflammatory arthritis. There is some mild motion loss in the knees and hips. That in the shoulders was associated with back pain. R. 239-247.

A Physical Residual Functional Capacity Assessment was performed by Thomas Lauderman, D.O. on May 24. 2004. Sharp was limited to: occasionally lifting and /or carrying 50 pounds; frequently lifting and /or carrying 25 pounds; standing and / or walking about 6 hours in an 8-hour workday; sitting with normal breaks for a total of about 6 hours out of an 8-hour workday; unlimited pushing and pulling. Sharp was not limited with respect to posture; manipulation, visual or communication. Sharp was unlimited with respect to: extreme heat; extreme cold; wetness; humidity; noise; vibration; hazards and was to avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation. R. 248-255.

Big Springs Clinic responded to the Disability Determination Section Inquiry with a report dated July 12, 2004. The doctor noted the last time he had seen Sharp prior to July 12, 2004 was August 2002. The Big Springs Clinic's records reflected a number of "no shows" by Sharp over the period from August 2002 through the July 12, 2004 physical exam. R. 260, 265-267. The doctor also noted that Sharp filed for Social Security Disability in March 2004. R. 259. Based on the physical examination of July 12, 2004, John Eilers, D.O. noted: "Pt. has complaints that are significant to his status of employable / disabled but have not been fully addressed. Pt. needs orthopaedic/neurosurgical w/u and cont'ing BP management." R. 258. The doctor opined: "I conclude at today's PE that the patient would be temporarily disabled until further w/u by ortho/neurosurg can be arranged and conclusions drawn." R. 259. Dr. Eilers noted on July 1, 2002 that there had been a "resolution of bronchitis has completely resolved complaints — 'never felt better in my life.'" R. 268

On July 22, 2004 Fulvio R. Franyutti, M.D. completed a Physical Residual Functional Capacity Assessment on Sharp. He opined Sharp was: limited to lifting 20 pounds occasionally; lifting 10 pounds frequently; standing and /or walking about 6 hours in and 8-hour workday; sitting with normal breaks about 6 hours in an 8-hour workday; unlimited pushing and pulling; had no postural limitations, manipulative limitations, visual limitations or communicative limitations; and was to avoid concentrated exposure to extreme cold and heat but was otherwise not limited by the environment. Franyutti noted Sharp was an "obese patient with hx [history] of exertional dypsnea, SOB [shortness of breath] & [unreadable] all considered & R.F.C. reduced to light because of pain & SOB & fatigue." R. 296-303.

X-rays (six views) of Sharp's lumbar spine performed and read January 28, 2005 showing "wedging at L1 but this may be physiologic. Normal vertebral body alignment and disc space height are maintained. No fractures are seen. Facet joints are within normal limits bilaterally." R. 319.

On February 7, 2005 Dr. Eilers ordered physical therapy for Sharp 3 times per week for a period of 12 weeks. R. 327. PT records reflect Sharp was compliant with this round of ordered PT. R. 326, 328 - 332.

On February 20, 2005 Sharp was diagnosed and treated for left lower lobe pneumonia. R. 341.

On April 25, 2005 Dr. John W. Eilers ordered a continuation of 8 weeks of physical therapy for Sharp. R. 322. Chris Davis PTA with David Lee, Physical Therapist reported that Sharp had not made appointments for physical therapy since April 27, 2005 in spite of calls from the PTA. R. 320. PT records reveal that between March 4, 2005 and April 22, 2005 Sharp attended and had therapy on 3/4/05, 3/7/05, 3/9/05, 3/11/05, 3/16/05, 3/18/05, 4/11/05, 4/13/05, 4/15/05, 4/18/05 and 4/22/05. During the same period of time Sharp cancelled therapy on 3/14/05, 4/1/05, 4/6/05 ("due to had

lawyer app.") and 4/20/05. There were two occasions when Sharp did not receive service for unstated reason and one occasion when his therapy was cancelled because "due to pool." R. 324-325.

On May 24, 2005 Sharp was seen at Davis Memorial Hospital for complaints of pain secondary to his reported falling at home the day before. No obvious deformities were noted on examination of the chest. Sharp was not noted to be in respiratory distress. Chest x-rays were taken and read as showing "[n]o acute bony injury is found." No pneumothorax or effusion was noted. the ribs demonstrated normal bony mineralization. R. 343-346.

Dr. James Ross read a portable chest x-ray of Sharp taken on August 14, 2005 and compared it to an earlier x-ray dated May 24, 2005. Dr. Ross noted that the later x-ray revealed the heart size to be within normal limits; no acute infiltrate or pleural effusion identified; and the bony structures were normal. R. 317.

Dr. John Logar read a Chest CT with contrast of Sharp done on August 14, 2005 as showing no filling defect within the pulmonary arteries to suggest pulmonary embolus; clear lungs; no filtrate or pleural effusion; no evidence of adenopathy; small cysts suspected in the posterior right hepatic lobe but no acute findings in the upper abdomen. R. 318.

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court

disagrees, so long as it is supported by substantial evidence." <u>Smith v. Schweiker</u>, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" <u>Hays</u>, 907 F.2d at 1456 (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Sharpe's RFC and Hypothetical to the VE

Sharp contends that the record contained substantial evidence of two particular limiting factors that the ALJ failed to include in his RFC and VE hypothetical.

First, Sharp testified at the hearing that his breathing impairment required him to use a nebulizer breathing treatment machine four to five times per day, two to three of which would fall within the course of an eight-hour day. He also testified that he did not use it the recommended six times per day because he was getting low on medicine for the machine. He testified it took him about 30 minutes to use the machine and clean it up and put it away after each use. R. 85.

Second, Sharp testified that he takes fluid medication (HCTZ 25 mg)(R. 168) daily in the morning. He further testified that within the first hour after taking the medication, he has to go to the bathroom three or four times. He further stated that "You don't go, you don't go as much, but you still go quite a bit. When you go, you got to go. You know what I mean. When it happens you

got to go right then. There's no holding it." R. 80.

The ALJ asked the following series of hypothetical questions of and received the following responses from the VE:

Q.    Okay. I want you to hypothetical individual same age, education and work experience as the claimant, would have the ability to do light would be limited to only occasionally climbing of ramps and stairs and balance and stooping, kneeling. Would the, wouldn't be able to do work in extremes of heat or cold. Work at unprotected heights or around dangerous moving machinery and wouldn't be able to do jobs in environments with excessive amounts of fumes, odor, dust or poor ventilation. Would there be any full time [inaudible] jobs such a hypothetical person could do in the local or national economy?

A.    Yes. [inaudible] define the local economy as 20% of all jobs in the State of West Virginia, based on Bureau of Labor statistics. There would be the work of a packer. In the local economy there are 56 jobs. In the national economy 28,644 jobs. There would be a work of an inspector. In the local economy there are 131 jobs. In the national economy 140,749 jobs. There would be the work of a sewing machine operator. In the local economy there are 69 jobs. In the national economy 114,248 jobs.

Q.    All right. I'm going to ask you another hypothetical. Like, similar to the previous hypothetical but in addition the individual would be limited to standing and walking no more than a half hour at a time and then would have to sit down for a few minutes. Could stand or walk for six hours in an eight hour day. Could sit for six hours in an eight hour day. but wouldn't be able to sit for more than an hour at a time, then would have to be able to change position. [inaudible] would the full-time, unskilled jobs such a hypothetical person would o in the local or national economy? It, you know jobs that you previous gave would they still be available [inaudible]

A.    [inaudible 20 seconds] I'd like to make sure I understand these hypotheticals--

Q.    Yes.

A.    Standing and walking for six hours, but would require to change position every half hour?

Q.    Right.

A.    The sitting would be six hours maximum.

Q.    And have to be able to change position after every hour.

A.    [inaudible 10 seconds] Okay. This, this individual would not be able to work as the packer, nor would the individual be able to work as an inspector. But would be able to still work as a sewing machine operator.

Q.    Any other jobs then?

A.    There, there would be a work of an assembler. In the local economy there would 16 jobs, in the national economy 26,093 jobs. There would be no

other jobs.

Q.      All right.  I want you to assume a hypothetical individual the same age, education and work experience as the claimant.  But would be limited to doing sedentary work.  Could sit for six hours in an eight hour day, but wouldn't be able to sit for more than an hour at a time and then would have to change position to stand or walk two hours in an eight hour day, but wouldn't be able to stand or walk for more than fifteen minutes at a time.  Would there be any full-time unskilled jobs such a hypothetical person could do in the local or national economy?

A.      Yes, Your Honor.  This individual would be able to work as a surveillance system monitor.  In the local economy there are 13 jobs.  In the national economy 12,947 jobs.  There would be a work of a packer at the sedentary level.  There are 7 jobs in the local economy.  10,560 jobs in the national economy.

Q.      All right.  I want you to assume a hypothetical individual same age, education, work experience as the claimant that would be limited to doing light work, but would be off task two hours out of an eight hour day due to his impairments. [inaudible] have to lay down or otherwise wouldn't be able to do his job.  Would there be any full-time, unskilled jobs such a hypothetical person could do in the local or national economy?

A.      There would be no jobs for this person hypothetical individual.

Following questioning by the ALJ, the VE was turned over to claimant's counsel for questioning.  Claimant's counsel asked the following questions getting the following answers into the record of the case for consideration by the ALJ in his decision making:

Q.      Dr. Ostrowski, if in addition to any of the hypothetical questions offered previously we added the following limitations: a hypothetical person would have to be allowed to bring the nebulizer machine to the work place and allowed to use the nebulizer machine two to three times per day for thirty minutes each time.  The person would also, at least during the morning shift, have to go to the bathroom three to four times per hour for about four to five minutes each time.  Also, the person would have to lay down for a total of about an hour during the day.  Would that affect any, any of the jobs that were previously mentioned?

A.      [inaudible] there would be no jobs for this hypothetical individual.

Claimant's argument that error was committed because the ALJ did not include certain alleged limitations makes no sense since counsel for the claimant included those very alleged limitations in his hypothetical to the VE and all of the VE's testimonial evidence was before the ALJ

for consideration. In trying to interpret Sharp's argument, the undersigned assumes what Sharp actually means is that the ALJ erred by not considering or being bound by the VE's responses that the additional limitations would preclude any jobs. Lee v. Sullivan, 945 F.2d 689 (4th Cir. 1991)(noting that a requirement introduced by claimant's counsel in a question to the VE "was not sustained by the evidence, and the vocational expert's testimony in response to the question was without support in the record.")

The question then presented is: Is there substantial evidence in the record which supports the factual underpinning of claimant's counsel's question to the VE?

In that regard, it must be noted that the listing of HCTZ 25 mg found on page 168 of the record is nothing more than a form filled out by Sharp in which he lists the medications he says he is taking and is a part of his statement made when he requested a disability hearing. R. 166-169 (Exhibit 10E).

Lisa Mullen, MD of Davis Memorial Hospital read a June 13, 2002 chest x-ray of Sharp as showing: "The lungs are clear and the costophrenic angles are sharp" and "no evidence for acute cardiopulmonary process." R. 280.

On June 21, 2002 Sharp had a CT with contrast of his chest at Davis Memorial Hospital which was read by Dr. Steven Barnett as "Normal CT scan of the chest." He did not see "any inflammatory change, mass, vascular abnormality or pleural fluid or thickening. The hilar and mediastinal areas appear normal as well with no mass or adenopathy. I see no abnormality of the airway structures." R. 269.

Earlier on July 1, 2002 Dr. Eiler of Big Springs Clinic saw Sharp and noted: "Advair Diskus}resolution of bronchitis has completely resolved complaints." At that time he noted Sharp stated: "never felt better in my life." R. 268.

Dr. Steven Barnett, MD interpreted a portable chest x-ray of Sharp's chest taken on September 4, 2003 as "demonstrates the lungs to be well inflated and clear" and as a "normal chest exam."

It must also be noted that Dr. Kip Beard examined Sharp at the Tri-State Occupational Medicine, Elkins, WV on May 3, 2004 reporting the following:

> Under History - "The claimant states he has noticed worsening shortness of breath over the last five to six years. he gets out of breath after about 100 yards on a level surface. he does not describe orthopnea or parxysmal nocturnal dyspnea. ... He has a cough that seems non-productive. he wheezes as well. He smokes 'every once in a while.' He gets through maybe a pack every two weeks. He states he was admitted to a hospital six years ago because of shortness of breath and chest pain. He was told he had a negative cardiac work-up at that time. He has not been admitted since. he is currently being treated with an Advair Diskus. He does not use nebulizers. He has never been on home oxygen. Hot weather can make it more difficult for him to breath."
>
> Under Review of Systems - "The is no reported urgency, frequency, dysuria or urinary hesitancy."
>
> Under Chest - "Examination of the chest reveals diminished breath sounds without wheezes, rales or rhonchi. There was no increased A/P diameter or prolonged expiratory component. I did not appreciate any exertional dyspnea or accessory muscle recruitment." R. 239-243.

At the time of Dr. Beard's exam, pre-medicated and post-medicated pulmonary function tests were performed on Sharp reflecting: " Severe Restrictive disease. No Improvement noted after bronchodilation. Submaximal effort." It should also be noted that the pre-med test noted "fair effort" in the "comments" section of the report. R. 245-246. It should also be noted that the technician noted that Sharp's cooperation during the testing was "adequate." R. 247.

Dr. Thomas O. Lauderman performed a Physical Residual Functional Capacity Assessment on May 24, 2004 in which Sharp was noted to have the following limitations:

Exertional
    Occasionally life and/or carry 50 pounds
    Frequently lift and/or carry 25 pounds
    Stand and/or walk about 6 hours in an 8-hour workday

Sit with normal breaks for a total of about 6 hours in an 8-hour workday
Push and/or pull unlimited other that as show for lift and/or carry
Postural
No limitations established
Manipulative
No limitations established
Visual
No limitations established
Communicative
No limitations established
Environmental
Avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc.

In the final notes supporting the conclusions of the report, Dr. Lauderman noted: "Invalid PFT (pulmonary function tests); RFC decreased 2 to pain and fatigue; PFS (pulmonary function study) - severe restrictive disease; FEV1 1.62 invalid." R. 248

Big Springs Clinic responded to the Disability Determination Section Inquiry with a report dated July 12, 2004. The doctor noted the last time he had seen Sharp prior to July 12, 2004 was August 2002. The Big Springs Clinic's records reflected a number of "no shows" by Sharp over the period from August 2002 through the July 12, 2004 physical exam. R. 260, 265-267. The doctor also noted that Sharp filed for Social Security Disability in March 2004. R. 259. Based on the physical examination of July 12, 2004, John Eilers, D.O. noted: "Pt. has complaints that are significant to his status of employable / disabled but have not been fully addressed. Pt. needs orthopaedic/neurosurgical w/u and cont'ing BP management." R. 258. The doctor opined: "I conclude at today's PE that the patient would be temporarily disabled until further w/u by ortho/neurosurg can be arranged and conclusions drawn." R. 259. Dr. Eilers noted on July 1, 2002 that there had been a "resolution of bronchitis has completely resolved complaints — 'never felt better in my life.'" Physical examination of Sharp resulting in findings of: "normal breath sounds; normal dyspnea; normal orthopnea; normal cyanosis; normal edema; and normal genito-urinary

system." R. 256-268.

On July 22, 2004 Fulvio R. Franyutti, M.D. completed a Physical Residual Functional Capacity Assessment on Sharp. He opined Sharp was: limited to lifting 20 pounds occasionally; lifting 10 pounds frequently; standing and /or walking about 6 hours in and 8-hour workday; sitting with normal breaks about 6 hours in an 8-hour workday; unlimited pushing and pulling; had no postural limitations, manipulative limitations, visual limitations or communicative limitations; and was to avoid concentrated exposure to extreme cold and heat but was otherwise not limited by the environment. Franyutti noted Sharp was an "obese patient with hx [history] of exertional dypsnea, SOB [shortness of breath] & [unreadable] all considered & R.F.C. reduced to light because of pain & SOB & fatigue." R. 296-303.

Dr. James Ross read a portable chest x-ray of Sharp taken on August 14, 2005 and compared it to an earlier x-ray dated May 24, 2005. Dr. Ross noted that the later x-ray revealed the heart size to be within normal limits; no acute infiltrate or pleural effusion identified; and the bony structures were normal. R. 317.

Dr. John Logar read a Chest CT with contrast of Sharp done on August 14, 2005 as showing no filling defect within the pulmonary arteries to suggest pulmonary embolus; clear lungs; no filtrate or pleural effusion; no evidence of adenopathy; small cysts suspected in the posterior right hepatic lobe but no acute findings in the upper abdomen. R. 318.

It must be noted that there is an undated instruction sheet from Davis Home Respiratory Care on Updraft Nebulizer Treatments which shows "Ventolin 0.5 and Other Q 4-6 as needed." R. 310.

In rendering his decision, the ALJ, having reviewed the medical record as did the undersigned, relied heavily on Dr. Beard's findings: "The Administrative Law Judge gives great weight to Dr. Beard's detailed physical findings as they are based on objective medical and clinical

evidence. The undersigned believe [sic] that while Mr. Sharp had some limitations caused by his overall physical condition, Dr. Beard's findings support the decision that the claimant was not precluded from at least sedentary work activities." The ALJ also gave "Dr. Eilers' treatment reports and the physical therapy treatment notes significant weight as to the overall physical complaints as they were based on objective medical and clinical evidence." R. 20. The ALJ expressed his belief that Eilers' reports "support[ed] the decision that the claimant is not precluded from at least sedentary work-related activities." R. 21. The ALJ reviewed the 2005 Davis Memorial Hospital Emergency Room Records, as did the undersigned, and did not find anything in those treatment reports that "materially changes the findings of Mr. Sharp's overall physical condition...." R. 21. Two state agency physicians did separate reviews of the medical evidence and each rendered RFC's that limited Sharp to the performance of medium to light physically exertional work activities. Notwithstanding that the ALJ found "sedentary functional activities ... more appropriate." R. 21. In doing so the ALJ noted he gave "claimant considerable benefit of the doubt as to his SOB and pain complaints in the establishment of the residual functional capacity more fully discussed below." R. 22. Sharp did complain in February 2004 of urinating every two hours and or urgency. Three months later, in May 2004 Sharp was noted to have "no reported urgency, frequency, dysuria or urinary hesitation." He also reported at that time that he did not use nebulizers. On examination, Dr. Beard did not appreciate any exertional dyspnea or accessory muscle recruitment. R. 239-243. In short, there is nothing in the record which substantially and objectively supports the limitations Sharp's counsel included in his hypothetical question to the VE or which would require the ALJ to consider the stated conclusory opinions of the VE made in response to those hypothetical questions.

"The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individuals's ability to do work-related activities." SSR 96-8p. "In order for a

vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, Chester v. Matthews, 203 F. Supp. 110 (D. Md. 1975), and it must be in response to propery hypothetical questions which fairly set out all of claimant's impairments." Stephens v. Secretary of Health, Education and Welfare, 603 F.2d 36 (8th Cir. 1979)."

In Koonce v. Apfel, 166 F.3d 1209 (4th Cir 1999), the Court held that an ALJ has "great latitude in posing hypothetical questions" and need only include limitations that are supported by substantial evidence in the record.

A review of the record does not reflect doctor's or nurses notations relative to Sharp actually using a breathing machine multiple times daily and having to prepare and clean the machine. The medical record is silent with respect to regular prescriptions or reordering of the prescriptions necessary for the use of the breathing machine. The instructions for the machine limit its use to "as needed" as opposed to definite scheduled number of times per day. The medical record is also silent with respect to frequency and urgency with respect to urination due to Sharp's taking medication to control fluid build up. In short, there is nothing in the medical record which substantiates Sharp's testimonial claims that he can't work because he has to frequently use a nebulizer machine and/or frequently go to the bathroom.

The undersigned does not do "a de novo review of the evidence." "The Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986). As previously noted substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a

verdict were the case before a jury, then there is 'substantial evidence.'" Hays, 907 F.2d at 1456 (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)).

The undersigned finds that the ALJ consideration and dismissal of Sharp's testimonial complaints of frequency of urination and frequent use of a nebulizer machine is supported by the substantial objective medical evidence in the record which was reviewed and discussed by the ALJ in his decision.

## B. Listing 3.02A

Social Security Listing 3.02A provides:

**A.** Chronic obstructive pulmonary disease due to any cause, with the $FEV_1$ equal to or less than the values specified in table I corresponding to the person's height without shoes. (In cases of marked spinal deformity, see 3.00E.);

### 1. Table I

| Height without Shoes (centimeters) | Height without Shoes (inches) | $FEV_1$ Equal to or less than (L,BTPS) |
|---|---|---|
| 154 or less | 60 or less | 1.05 |
| 155-160 | 61-63 | 1.15 |
| 161-165 | 64-65 | 1.25 |
| 166-170 | 66-67 | 1.35 |
| 171-175 | 68-69 | 1.45 |
| 176-180 | 70-71 | 1.55 |
| 181 or more | 72 or more | 1.65 |

Sharp was tested by Tri-State Occupational Medicine, Inc. on April 28 2004. At the time of the test Sharp was 74" tall and weighed 306 pounds. His actual results were reported:

| | | | |
|---|---|---|---|
| Pre-Med FEV1 | 1.62 | 1.32 | 0.92 |
| Pre-Bronchodilator FVC | 2.46 | 1.44 | 0.96 |
| Pre-Med FEV1/FVC | 0.79 | 0.66 | 0.96 |
| Post-Med FEV1 | 1.97 | 1.70 | 0.80 |
| Post Med FVC | 2.81 | 2.73 | 2.38 |
| Post-Med FEV1/FVC | 0.79 | 0.70 | 0.34 |

The Tri-State technician conducting the test, R. King noted: "Severe Restrictive disease. R.245. Dr. Beard apparently adopted the test results as he noted: "Pulmonary functions reveal severe restrictive disease." R. 243. Technician King also noted: "No Improvement noted after bronchodilation. Submaximal Effort." In another portion of the form report the technician noted "fair effort." R. 245. On the Ventilatory Function Report Form it was noted that Sharp's cooperation in the testing was "adequate." The other option on the form was "unsatisfactory" and that option was not marked. R. 247.

It is not disputed that Sharp was diagnosed and treated for COPD. For his weight and height, Sharp's pre-med FEV1 was lower than the 1.65 listing. Sharp's post-med FEV1 was twice above the listing limit of 1.65 and once below that limit at 0.80. Sharp's pre-med FVC was once above the listing limit of 1.85 at 2.46 and twice below the listing limit. His post-med FVC was above the listing limit of 1.85 each time to wit: 2.81, 2.73 and 2.38. The record shows a total of 15 tests 8 of which were pre-med and 7 of which were post-med. It is not known what the results of the other 7 tests were. R. 245-246.

With respect to whether Sharp met the listing, the ALJ found: "An April 28, 2004 pulmonary function test (PFT) showed only a fair (submaximal) effort with FVC - 2.81 (listing 2.85)[1] and FEV1

---

[1]The notation of the FVC listing at "2.85" is a scrivener error. The listing is 1.85.

- 1.97 (listing 1.65). Interpretation: severe restrictive disease. Since the effort was only fair, it is reasonable to assume the claimant did not meet the severity of the COPD listing 3.02." The ALJ did not stop with the pulmonary function study. He continued in his analysis as follows: "the April 27, 2004 x-rays of the chest x-rays were normal with the lung fields clear and a normal heart configuration. ... Dr. Beard's summary: Mr. Sharp had a history of shortness of breath. Examination of the lungs today showed diminished breath sounds without wheezes, rales or rhonchi. There was no appreciation of exertional dyspnea or accessory muscle recruitment and there was no clubbing or cyanosis.

Based on the foregoing evidence as well as other record evidence[2], the undersigned finds that

---

[2]Lisa Mullen, MD of Davis Memorial Hospital read a June 13, 2002 chest x-ray of Sharp as showing: "The lungs are clear and the costophrenic angles are sharp" and "no evidence for acute cardiopulmonary process." R. 280.

On June 21, 2002 Sharp had a CT with contrast of his chest at Davis Memorial Hospital which was read by Dr. Steven Barnett as "Normal CT scan of the chest." He did not see "any inflammatory change, mass, vascular abnormality or pleural fluid or thickening. The hilar and mediastinal areas appear normal as well with no mass or adenopathy. I see no abnormality of the airway structures." R. 269.

Earlier on July 1, 2002 Dr. Eiler of Big Springs Clinic saw Sharp and noted: "Advair Diskus}resolution of bronchitis has completely resolved complaints." At that time he noted Sharp stated: "never felt better in my life." R. 268. Dr. Eilers noted on July 1, 2002 that there had been a "resolution of bronchitis has completely resolved complaints — 'never felt better in my life.'" Physical examination of Sharp resulting in findings of: "normal breath sounds; normal dyspnea; normal orthopnea; normal cyanosis; normal edema; and normal genito-urinary system." R. 256-268.

Dr. Steven Barnett, MD interpreted a portable chest x-ray of Sharp's chest taken on September 4, 2003 as "demonstrates the lungs to be well inflated and clear" and as a "normal chest exam."

On May 24, 2005 Sharp was seen at Davis Memorial Hospital for complaints of pain secondary to his reported falling at home the day before. No obvious deformities were noted on examination of the chest. Sharp was not noted to be in respiratory distress. Chest x-rays were taken and read as showing "[n]o acute bony injury is found." No pneumothorax or effusion was noted. the ribs demonstrated normal bony mineralization. R. 343-346.

Dr. James Ross read a portable chest x-ray of Sharp taken on August 14, 2005 and compared it to an earlier x-ray dated May 24, 2005. Dr. Ross noted that the later x-ray revealed the heart size to be within normal limits; no acute infiltrate or pleural effusion identified; and the

the ALJ's decision that Sharp did not meet the listing under 3.02A is supported by substantial evidence.

## C. Credibility

ALJ Moon decided Sharp's credibility as follows:

> The Administrative Law Judge does not find Mr. Sharp to be fully credible as to the nature and severity of his impairments in preventing all work-related activities. The objective radiological evidence and detailed clinical evidence does not support severity of the claimant's alleged physical limitations. The claimant has significant pulmonary problems but continues to smoke cigarettes. He said did not drink alcohol but on the January 21, 2004 ER visit when he alleged a fall, he smelled of alcohol. Mr. Sharpe described his activities of daily living as being so restrictive it could characterized as essentially an invalid life style. He also alleges that he has frequent falls as a result of muscle weakness. However, there is no objective medical or clinical findings in all of the detailed musculoskeletal or neurologic evaluations discussed above to support these allegations.

Craig v. Chater, 76 F.3d 585, 592, is generally recognized as contained the Fourth Circuit authoritative statement of the standard analysis to be used in evaluating the issue of credibility. The Court stated:

> . . . for disability to be found, an underlying medically determinable impairment resulting from some demonstrable abnormality must be established. While the pain caused by an impairment, independent from any physical limitations imposed by that impairment, may of course render an individual incapable of working, *see Myers v. Califano*, 611 F.2d 980, 983 (4th Cir. 1980), allegations of pain and other subjective symptoms, without more, are insufficient. As we said in *Gross v. Heckler*,'[p]ain is not disabling *per se*, and subjective evidence of pain cannot take precedence over objective medical evidence or the lack thereof.' 785 F.2d 1163, 1166 (4th Cir. 1986) (quoting *Parris v. Heckler*, 733 F.2d 324, 327 (4th Cir. 1984); *see also* 20 C.F.R. §§ 416.928(a) & 404.1528(a) ('[A claimant's] statements .

_____

bony structures were normal. R. 317.

Dr. John Logar read a Chest CT with contrast of Sharp done on August 14, 2005 as showing no filling defect within the pulmonary arteries to suggest pulmonary embolus; clear lungs; no filtrate or pleural effusion; no evidence of adenopathy; small cysts suspected in the posterior right hepatic lobe but no acute findings in the upper abdomen. R. 318.

. . alone . . . are not enough to establish that there is a physical or mental impairment.')

In order to make this statutory requirement even more plain, Congress in 1984 amended Title II of the Social Security Act, purportedly to codify the regulatory standard for evaluating pain. *See* S.Rep.No. 466, 98th Cong., 2d Sess. 23-24 (1984); H.R. Conf. Rep. No. 139, 98th Cong., 2d Sess. 29 91984), *reprinted in* 1984 U.S.C.C.A.N. 3080, 3087-88. The amendment, in language which closely paralleled the secretary's 1980 regulations, *see* 20 C.F.R. §§416.929 & 404.1529 (1983) provides that

> [a]n individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all the evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability. Objective medical evidence of pain or other symptoms established by medically acceptable clinical or laboratory diagnostic techniques (for example, deteriorating nerve or muscle tissue) must be considered in reaching a conclusion as to whether the individual is under a disability.

The Fourth Circuit also noted in <u>Craig</u>:

> This is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent

with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers:

> We will consider your statements about the intensity, persistence, and limiting effects of your symptoms, and we will evaluate your statements in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether you are disabled. We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence, including your medical history, the medical signs and laboratory findings, and statements by your treating or examining physician or psychologist or other persons about how your symptoms affect you. *Your symptoms, including pain, will be determined to diminish your capacity for basic work activities . . . to the extent that your alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence.*

Id. at 595-596.

The Court outlined a two step process for use in determining whether a person is disable by pain or other symptoms:

> Under these regulations, the determination of whether a person is disabled by pain or other symptoms is a two-step process.    First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. 20 CFR §§ 416.929(b) & 404.1529(b). Id. at 594.

The Court went on to state:

> It is only *after* a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated. *See* 20 CFR §§ 416.929(C)(1) & 404.1529 (C)(1). Id. at 595.

SSR96-7p(5) further provides:

It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations had been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual statements and the reason for that weight.

One strong indication of the credibility of an individual's statements is their consistency both internally and with other information in the case record. The adjudicator must consider such factors as:

The degree to which the individual's statements are consistent with the medical signs and laboratory findings and other information provided by medical sources, including information about medical history and treatment.

The consistency of the individual's own statements. The adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record. Especially important are statements made to treating or examining medical sources and to the "other sources" defined in 20 CFR 404.1513(e) and 416.913(e). The adjudicator must also look at statements the individual made to SSA at each prior step of the administrative review process and in connection with any concurrent claim or, when available, prior claims for disability benefits under titles II and XVI. Likewise, the case record may contain statements the individual made in connection with claims for other types of disability benefits, such as workers' compensation, benefits under programs of the Department of Veterans Affairs, or private insurance benefits. However, the lack of consistency between an individual's statements and other statements that he or she has made at other times does not necessarily mean that the individual's statements are not credible. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms. Therefore, the adjudicator will need to review the case record to determine whether there are any explanations for any variations in the individual's statements about symptoms and their effects.

The consistency of the individual's statements with other information in the case record, including reports and observations by other persons concerning the individual's daily activities, behavior, and efforts to work. This includes any observations recorded by SSA employees in interviews and observations recorded by the adjudicator in administrative proceedings.

SSR 96-7p further provides:

In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 CFR 404.1529(c) and 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements:

1. The individual's daily activities;
2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

In <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990), the Fourth Circuit stated that the ALJ bears the ultimate responsibility for weighing the evidence and resolving any conflicts, and that, in reviewing for substantial evidence, the reviewing court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner.

The ALJ's credibility determination in Sharp is not textbook perfect. However, it is supported by substantial evidence in the record as a whole and generally alluded to in the written decision.

First, the ALJ notes that Sharp's own treating physician did not express an opinion that Sharp was permanently disabled. Notwithstanding that, the ALJ did take into consideration that Dr. Eilers had opined that Sharp was temporarily disabled pending additional medical work up. That additional medical work up was focused on Sharp's orthopaedic complaints: Based on the physical examination

of July 12, 2004, John Eilers, D.O. noted: "Pt. has complaints that are significant to his status of employable / disabled but have not been fully addressed. Pt. needs orthopaedic/neurosurgical w/u and cont'ing BP management." R. 258. The doctor opined: "I conclude at today's PE that the patient would be temporarily disabled until further w/u by ortho/neurosurg can be arranged and conclusions drawn." R. 259. It is interesting to the undersigned that Dr. Eilers did not mention COPD or urinary frequency as problems in his 2004 evaluation.

Second, the ALJ notes that the "objective radiological evidence and detailed clinical evidence does not support severity of the claimant's alleged physical limitations." While it would have been more clear had the ALJ identified the specific physical limitations to which he was referring, the undersigned has previously noted it is clear from the record that there is no substantial evidence supporting the restrictions suggested by Sharp's counsel: that Sharp cannot work because he has to use and clean a nebulizer machine 4 to 5 times daily and has frequency and urgency in urination during the early part of the day due to fluid medication he takes. To prove the negative, the ALJ would have had to do what the undersigned has done, to-wit: repeat a majority of the medical evidence to show that there is little or no mention of the two specific problems Sharp now raises. It is the finding and conclusion of the undersigned that the ALJ's above quoted notation, when taken in the context of the record in the case, is sufficient reasoning for his not finding credible Sharp's claims that he cannot work because he allegedly has to use and clean a nebulizer machine 4 to 5 times daily and allegedly has frequency and urgency in urination during the early part of the day due to fluid medication he takes.

Next, the medical record does support the ALJ's stated conclusions that:

1) Sharp continued to smoke even though he was diagnosed with COPD and was advised against smoking by his doctors;

2) Sharp smelled of alcohol on the date he came to the ER complaining about a fall and denied use of alcohol as a possible cause of the alleged fall (January 21, 2004); and

3) In spite of frequent visits to medical facilities complaining of falls, the x-rays and physical examinations conducted on Sharp failed to provide substantial objective proof of injuries which would likely result for the such a fall by a moderately obese man like Sharp or substantial objective evidence of a condition or conditions that would explain Sharp's propensity to fall.

The ALJ's credibility determination is entitled to great weight because he is able to observe the individual's actions and his demeanor. Shively v. Heckler, 739 F.2d 987, 989-990 (4th Cir. 1984). The Court should not dismiss the ALJ's credibility determination based on its review of a barerecord. The record as a whole in this case supports the ALJ's credibility determination and there is no showing the ALJ was patently wrong.

Accordingly, the undersigned declines to recommend overturning the non-disability decision of the Commissioner based on alleged technical defects in the ALJ's credibility determination.

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI. I accordingly recommend Plaintiff's Motion for Summary Judgment be **DENIED**, Defendant's Motion for Summary Judgment be **GRANTED,** and this action be retired from the docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and

Recommendation. 28 U.S.C. § 636(b)(1); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), <u>cert.</u> <u>denied</u>, 467 U.S. 1208 (1984); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 10th day of January 2008.

*John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE